NOT DESIGNATED FOR PUBLICATION

No. 114,954

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALISHA A. FRAKES, n/k/a ALISHA A. BAKER,
*Appellant*,

v.

DARIN W. FRAKES,
*Appellee*.

MEMORANDUM OPINION

Appeal from Montgomery District Court; FREDERICK W. CULLINS, judge. Opinion filed August 19, 2016. Affirmed.

*Seth A. Jones*, of Hines and Jones, P.A., of Erie, for appellant.

*Bruce W. Beye*, of Overland Park, for appellee.

Before MALONE, C.J., HILL and ATCHESON, JJ.

*Per Curiam:* Claiming an abuse of discretion, Alisha A. Frakes asks us to overturn the district court's ruling placing two of her minor children with her former husband, Darin W. Frakes. Our review of the record reveals substantial evidence to support the district court's findings. Also, the court correctly followed the law. We find no abuse of discretion and, thus, we affirm.

The court issued a default decree of divorce to Alisha in September 2010. She received sole custody of the parties' minor child, B.F., born in 2009. According to the

1

decree, Darin's parenting time would be at Alisha's discretion and supervision. The parties' second child, M.S., was born in 2010.

Then, Darin asked the court to establish parenting time in 2013. As a result, Darin received parenting time with both children on the third weekend of each month and on certain holidays. He was also to have telephone calls with the children each Sunday at 5 p.m. The district court ordered the parties to communicate regarding parenting time by e-mail and text messages only.

This system did not last. In September 2014, Alisha sought a temporary order suspending Darin's parenting time pending an investigation of a sexual abuse allegation against Darin by the Kansas Department of Children and Families. The allegation was that Darin sexually abused one of Alisha's children from a different relationship. The court granted the motion.

The following month, Darin asked the court to modify custody, change primary residence of both children, and to modify child support. He raised several concerns about Alisha's conduct. She had:

- attempted to thwart his parenting time;
- refused to answer Darin's telephone calls to his children or created an environment during Darin's telephone calls such that the conversations were not meaningful;
- made baseless allegations against him to limit his parenting time;
- fought with her new husband and the children's safety may be in danger;
- allowed the children to educationally fall behind other children of a similar age;
- failed to take the court-mandated "parenting through divorce" class; and
- engaged in conduct to purposefully alienate Darin's children against him.

Here is a summary of the evidence in the record on each point.

*Loss of parenting time*

Darin testified that he had been consistently exercising his parenting time without incident. But on one occasion Alisha did not appear at the exchange site to drop off the children on July 4. He had sent a text to Alisha the week before and asked if he could keep the children until Sunday at 6. Alisha did not respond. He went to the exchange site on July 3, but Alisha did not appear. He sent a text to Alisha. He then went to the Iola police station where an officer called Alisha and left a message, but Alisha did not respond back. He testified that Alisha did later agree to make up the parenting time. The July 4 holiday was the only time he was denied his parenting time since the court's order establishing a parenting time schedule.

Alisha testified that the missed parenting time on July 4 was unintentional. She confused Darin's parenting schedule with the parenting schedule of Keith Copithke, her ex-husband. When Copithke has his children on Memorial Day, then Alisha has them on July 4. But the parenting plan with Darin is different. Darin was supposed to have the children on both Memorial Day and July 4. Alisha testified that she did not receive any text messages from Darin and did not receive a phone call from the Iola police department. When Darin brought the missed parenting time to her attention by e-mail, she allowed Darin to have additional parenting time with the children to make up for that error.

*Loss of telephone calls*

Darin testified that Alisha has denied him his weekly phone call "a couple of [times]." He testified that there has been a lot of interference when he has talked to the children on the phone. For example, once Alisha asked one of the children, B.F., if he

3

wanted a piece of pizza while Darin was talking to him. At other times, Darin has heard dogs barking and other kids talking or whispering in the background. A few times he was told that the younger child, M.S., was sleeping. During one of his calls, the children were at the park. He testified it was difficult to maintain the children's attention on the phone. He testified that his calls with the children had grown longer recently—23 minutes on July 12 and almost 18 minutes on July 26, but the calls have not always been that long. Darin admitted that he had missed one phone call because he "got preoccupied and just totally blew it off." He also admitted that once he called an hour late.

Darin testified that he typically does not get a response from Alisha when he sends her a text message about the children.

Alisha testified that she had a special phone she called the "Darin phone" that was only for Darin's calls. This was a different phone than her personal phone. The court questioned why Alisha would have a special "Darin phone" that was not picked up often, reviewed often, or easily accessible rather than give Darin her personal phone number. Alisha explained that in the past Darin had harassed her over the phone and so she did not want him to have it. Alisha testified she responded to Darin's texts when she received them.

Alisha testified that she has not ignored Darin's calls, except for one time. On December 29, 2013, she did not permit Darin to have his weekly phone call, texting, "It's my holiday time." Otherwise, she has answered Darin's Sunday calls no matter where she has been or what she has been doing. She testified that even though sometimes she and the family have been at church, fishing, or at a family gathering, Darin's calls have been answered. She has provided a quiet environment for the children to have phone calls with Darin. She has tried to provide them a separate room to talk. When the children have attempted to cut the conversations short or gotten distracted, she has encouraged them to talk.

4

In contrast, B.C., the daughter of Alisha and Keith Copithke, testified that Darin's calls have never taken place while the family was at a park or anywhere outside the home. The children have never been outside the house when Darin has called on Sunday. B.C. testified that the children have been put in a room by themselves so they can talk to Darin in private.

*Allegations of sexual abuse*

At the hearing, Alisha's attorney presented the court with a notice from the DCF stating that its investigators could not substantiate the sexual abuse allegation against Darin and presented a letter from the district attorney stating that no criminal prosecution would be pursued. Because the investigation had concluded, Alisha no longer wanted to limit Darin's parenting time.

Darin testified that he believed Alisha fabricated the sexual abuse allegation to restrict his parenting time. Darin testified that on August 24, 2014, he sent Alisha a text message stating that she was going to hear from his lawyer because his parenting time was being frustrated. She did not respond, and 2 days later she filed the sexual abuse report.

B.C. testified that she was present when her brother said that Darin had sexually abused him. The boy all of a sudden started crying and said that Darin had put his "private part" in the boy's mouth.

Alisha testified that she called an employee of the DCF who instructed her to make a report about the sexual abuse allegation. She testified that "[i]t just happened to be" 2 days after Darin threatened to contact his lawyer.

Keith Copithke, who had been married to Alisha, testified that he was the subject of a sexual abuse allegation when she filed for divorce from him 12 or 13 years earlier. He testified that a DCF investigation exonerated him. He believed Alisha made up the sexual abuse allegation in an attempt to get residential custody of their children. Alisha had received residential custody of all three of their children.

Alisha testified that she did not make an allegation of sexual abuse against Copithke. She testified that their child had told a daycare provider that "her daddy had touched her" and the daycare worker had reported it. Alisha testified that she never filed a motion with the court alleging sexual abuse against Copithke.

At this point, Alisha's attorney asked the court to interview the 8-year-old child who made the sexual abuse allegation against Darin to show that Alisha did not manufacture the allegation. The court declined to interview the child.

*Children's health and emotional well-being*

Darin testified that he heard Alisha scream at her children and call them "little bastards" once when they entered the bathroom while she was getting ready. She also referred to B.F. as a "mistake."

Darin testified that in December he discovered M.S. had head lice. He sent a message to Alisha about the head lice, but Alisha did not respond. Darin treated the head lice. Darin texted Alisha again in January to tell her that M.S. still had head lice, and Alisha still did not respond. Darin treated M.S.'s head lice, but he did not believe that Alisha was treating it. The third time Darin texted Alisha, she responded that M.S. got the lice from a little girl at church. The fourth time, Alisha responded that it was eczema and dandruff. Darin sent a picture to Alisha and said it had been going on for the last 4

6

months. Darin eventually took M.S. to the hospital because the problem was ongoing and he got a prescription for medication.

Darin testified that he had been taking the children to a licensed play therapist. He testified that the children seemed to really enjoy it. It gave them a third party to talk to without fear of revenge.

Alisha testified that she notified Darin when B.F. had hand-foot-and-mouth disease. Darin admitted that Alisha did e-mail him about the hand-foot-and-mouth disease, but he did not notice the e-mail until after the fact.

Darin testified that he believed the children were developmentally delayed. He told Alisha that they needed to start working with the children because the children did not know their left from their right or how to tie their shoes. Darin testified that Alisha did not communicate to him information about the children. Alisha did not notify Darin when she put B.F. into the Jump Start program and waited until the last minute to notify him about kindergarten roundups.

Alisha testified that she had the children do an interactive program to teach them their left and their right and how to tie their shoes. She testified that the children's school was given Darin's address so they could send him notifications about when school starts and the Jump Start program.

*Alienation of the children*

Darin testified that Alisha has referred to her current husband, Jacob, as "Daddy" when talking about Darin's children. Darin saw a picture of Jacob and M.S. on Facebook with the caption, "Daddy and [M.S.] playing with Little Ponies."

Alisha testified that she has called Jacob "Daddy" in front of the children because he is the daddy of one of her children. "[I]t's just a general term." B.F. has called him "Jacob." M.S. has called him her "stepdaddy." M.S. had called Jacob "daddy" in the past because Darin was not around when M.S. was younger. Alisha told M.S., "no, Darin's your daddy." But more recently, M.S. has called Jacob either "Jacob" or "stepdaddy."

Even so, B.C. testified that the children have never called Jacob "Daddy." B.C. also testified that Alisha does not call Jacob "Daddy" in front of the children; she calls him "Jacob." B.C. testified that she has never heard Alisha make any derogatory comments about her own father, Darin, or anyone else. Alisha encouraged a relationship with her children's fathers.

Darin testified that he believed Alisha alienated all of her children against their fathers.

Copithke testified that he had parenting time with two of his three children. He testified that Alisha has delivered the children to him as required by court order so that he could exercise his parenting time "[n]ot always," but "[m]ost of the time." He testified that Alisha, at times, frustrated or interfered with his parenting time.

Alisha testified that she has not interfered with Copithke's parenting time. Alisha testified that she has one child whose father is not really involved in the children's lives. And she has never interfered with or restricted the ability of the child's father to see him. Her school-aged children do well in school and are in extracurricular activities. All of her children love each other and are very close.

*The district court ruled in Darin's favor.*

After the district court found that there had been a material change in circumstances, it found that Alisha did not foster a relationship with Darin. Rather, she "work[ed] both actively and passively against that relationship" as shown by:

(1) the accusation of sexual abuse against Darin;

(2) Alisha ignored Darin's text messages and phone calls;

(3) Alisha failed to communicate with Darin about the health and educational needs of the children; and

(4) Alisha referred to her new spouse as "daddy" in front of the children.

The court found that it would be in the best interests of the children for Darin to have primary custody of the minor children because he understood the importance of fostering a relationship between the two parents. Also, the court found that Darin was more likely to provide for the physical, medical, and emotional needs of the children because he addressed the lice problem and had put the children in therapy. The court found that a common thread among Alisha's other children was that there was little or no relationship between the children and their fathers. The court awarded Darin residential custody of the minor children subject to Alisha's parenting time. The court adopted Darin's proposed parenting plan.

In her condemnation of the district court's ruling, Alisha contends the judge ignored every statutory factor listed in K.S.A. 2015 Supp. 23-3203. She challenges the district court's lack of findings regarding each statutory factor and argues that more factors weigh in her favor. Darin argues that we should reject Alisha's scorecard approach of totaling up all 18 statutory factors. Instead, in Darin's view, we should look only at the three critical factors that led the district court to rule as it did.

9

*The rules we must follow are well established.*

A district court's order granting or denying a modification to a child custody or residency order will not be disturbed in the absence of an abuse of discretion. See *In re Marriage of Grippin*, 39 Kan. App. 2d 1029, 1031, 186 P.3d 852 (2008). A judicial action constitutes an abuse of discretion if it (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Frazier v. Goudschaal*, 296 Kan. 730, 755, 295 P.3d 542 (2013). An appellate court reviews the evidence in the light most favorable to the prevailing party to determine if the district court's factual findings are supported by substantial competent evidence and whether they support the court's legal conclusions. This court does not reweigh the evidence, pass on witness credibility, or redetermine questions of fact. *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 704-05, 229 P.3d 1187 (2010).

The paramount consideration of the district court in deciding child custody or residency is the best interests of the children. K.S.A. 2015 Supp. 23-3201; *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011). To aid the district court, K.S.A. 2015 Supp. 23-3203 provides a list of factors the district court can consider, if relevant:

> "(a) Each parent's role and involvement with the minor child before and after separation;
> "(b) the desires of the child's parents as to custody or residency;
> "(c) the desires of a child of sufficient age and maturity as to the child's custody or residency;
> "(d) the age of the child;
> "(e) the emotional and physical needs of the child;
> "(f) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;
> "(g) the child's adjustment to the child's home, school and community;

10

"(h) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

"(i) evidence of spousal abuse, either emotional or physical;

"(j) the ability of the parties to communicate, cooperate and manage parental duties;

"(k) the school activity schedule of the child;

"(l) the work schedule of the parties;

"(m) the location of the parties' residences and places of employment;

"(n) the location of the child's school;

"(o) whether a parent is subject to the registration requirements of the Kansas offender registration act . . .

"(p) whether a parent has been convicted of abuse of a child . . .

"(q) whether a parent is residing with an individual subject to registration requirements . . .

"(r) whether a parent is residing with an individual who has been convicted of abuse of a child . . . ."

We begin by noting that Alisha did not object to the district court's lack of findings when it did not refer to all 18 statutory factors. Our Supreme Court Rule 165 (2015 Kan. Ct. R. Annot. 257) places a duty on the district court to provide adequate findings of fact and conclusions of law on the record. A party, however, must object to inadequate findings of fact and conclusions of law to preserve that as an issue for appeal. Such objection gives the district court an opportunity to correct any alleged inadequacies. *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013).

Without such an objection, an appellate court can generally presume the district court found all facts necessary to support its judgment, unless meaningful appellate review is precluded by the lack of findings. *O'Brien v. Leegin Creative Leather Products,*

11

*Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012). The function of the appellate court when the trial court fails to make adequate findings is to review the record to determine whether the record supports the presumption that the trial court found facts sufficient to support its judgment. *In re Marriage of Whipp*, 265 Kan. 500, 509, 962 P.2d 1058 (1998).

Indeed, we have held that a district court's failure to explicitly refer to each factor identified in K.S.A. 2015 Supp. 23-3203 is not fatal. See *In re Marriage of Vandenburg*, 43 Kan. App. 2d at 703; *In re Marriage of Henry and Moore*, No. 105,861, 2012 WL 1450489, at *5-6 (Kan. App. 2012) (unpublished opinion). The statute simply does not require the district court to make specific findings with respect to each factor on the record.

We will look first at the factors that Alisha claims the court ignored:

- her involvement with the children;
- the children's close relationship with other minor children in Alisha's household;
- a history of phone harassment by Darin;
- Darin's inconsistent work hours;
- the deleterious effect on the children from moving from Columbus to Gardner;
- her plans for enrolling the children in school.

Our review of the record does not persuade us that we should reverse the trial court for any of these reasons.

Alisha contends that she has spent significantly more time with the children than Darin, so her role and involvement with the children is greater. K.S.A. 2015 Supp. 23-3203(a) provides that the district court should consider each parent's role and involvement with the minor child before and after separation. Mother's argument is

12

apparently that because she has had primary residential custody of the children, she should continue to have primary residential custody of the children. However, this argument would preclude changing custody in all cases.

The district court found that it was important for Darin to have a relationship with the children and because Alisha would not foster that relationship, it was in the best interests of the children for Darin to have primary residential custody. That finding was supported by Darin's testimony that Alisha alienated the children against him by calling her new husband "daddy" in front of the children. Also, she had interfered with his phone calls and generally did not communicate with him about the children.

Next, Alisha contends that the district court ignored testimony that the minor children have a relationship with their half-siblings and friends in the southeast Kansas area. She cites *Cheney v. Poore*, 301 Kan. 120, Syl. ¶ 2, 127, 339 P.3d 1220 (2014), which held that separating a child from a half-sibling sharing residence with a parent is a factor that should be considered in making a residency determination.

Indeed, K.S.A. 2015 Supp. 23-3203(f) provides that the court should consider the interaction and interrelationships of the child with parents, siblings, and any other person who may significantly affect the child's best interests. K.S.A. 2015 Supp. 23-3203(g) provides the court should consider the child's adjustment to the child's home, school, and community.

Alisha did testify that all of her children were "very close."  They had friends and were involved in church activities. The children got along "very well" with her new husband. Darin testified that the children have a strong relationship with his girlfriend. He testified that his girlfriend has a 17-year-old son. With regard to the children's half-siblings that live with Alisha, the court said only that there was a common thread among them that there was little or no relationship facilitated by Alisha with their fathers. The

13

court did not speak to the relationship among the children. Realistically, we cannot see how this factor overcomes the court's other findings.

Moving on, Alisha next argues that Darin has harassed her on the telephone and the court ignored that evidence. While K.S.A. 2015 Supp. 23-3203(i) requires the district court to consider evidence of spousal abuse, if any, Alisha simply contended that "in the past" she had problems with phone harassment from Darin. Obviously, the court was not required to consider spousal abuse as a factor if it was not relevant. See K.S.A. 2015 Supp. 23-3203. We see no evidence of ongoing spousal abuse in this record.

Similarly, Alisha argues the court ignored the evidence that Darin's work schedule is inconsistent, thus making placement of the children with him unworkable. K.S.A. 23-3203(l) requires the district court to consider the parties' work schedule. Darin works in the construction industry. His work schedule is weather-dependent. He may work 50 hours one week, 60 hours another week, and 32 hours the next week. Darin also testified he lived with his girlfriend.

Alisha works from midnight until 8 a.m. Her husband is home with the children during this time. Her husband works from 4 p.m. to 10 p.m. Although the parties testified about their respective work schedules, there was no evidence that either party would be incapable of caring for the children due to their work schedules.

For her next complaint about the court, Alisha contends that it ignored the fact that the children have lived in southeast Kansas their entire lives and that Darin lives in northeast Kansas. K.S.A. 2015 Supp. 23-3203(m) requires the district court to consider the location of the parties' residences. Darin lives in Gardner, Kansas. Alisha lives in Columbus, Kansas. She moved there in June 2013. At the time of the hearing, the children had lived in Columbus for only 2 years. This is not like cases where children

14

move a half a continent away. Again, we see nothing so significant here that it would lead us to overturn the court's decision.

Alisha stated that she presented a clear plan for enrolling the children in school, whereas Darin had not researched the Gardner school district. K.S.A. 2015 Supp. 23-3203(n) requires the district court to consider the location of the children's schools. However, these children are barely school-aged. The hearing was held in July. When asked about the school districts in Gardner, Darin stated that he had not looked it up but believed they were ranked pretty high in the state and nation.

Finally, Alisha argues that the district court ignored the evidence presented in her favor. She contends that the evidence showed she was more able to meet the emotional and physical needs of the children. She contends that the district court ignored evidence that showed she did foster a relationship between the children and Darin. And, she contends that there was evidence that she did communicate information regarding the children to Darin.

Actually, Alisha asks us at this point to reweigh the evidence, which this court cannot do. See *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 704-05. There was substantial evidence to support the district court's findings on these factors.

The law, K.S.A. 2015 Supp. 23-3203(e), requires the district court to consider the emotional and physical needs of the children. The district court found that Darin had demonstrated his ability to provide for the emotional and physical needs of the children. "Among other things, Father has entered the minor children into a therapy program, has proactively attended to the minor children's health issues, and has taken efforts to foster a relationship between Mother, her new spouse, and the minor children."

15

The district court's findings are supported by the record. Darin discussed in depth how he had dealt with M.S.'s head lice that went on for months. He testified that the children really enjoyed play therapy. And, he testified that if he was awarded primary residential custody, he would keep Alisha well informed about the children and would agree to liberal parenting time for her.

Going deeper, K.S.A. 2015 Supp. 23-3203(h) requires the district court to consider the willingness and ability to appreciate the bond between the children and the other parent and to allow for a continuing relationship between the child and the other parent. A panel of this court has held that a failure to foster a relationship with the other parent can constitute a material change in circumstances. See *In the Matter of Chance and Chance*, No. 108,489, 2013 WL 1729272, at *8 (Kan. App. 2013) (unpublished opinion).

Here, the court found that Alisha does not foster a relationship between the minor children and Darin for many reasons that are supported by the record. Alisha testified that she refers to her husband, Jacob, as "daddy" in front of the children. Darin testified on several occasions that Alisha had ignored his text messages about the children. Alisha testified that she had a special phone called the "Darin phone" on which Darin was to communicate. We note that this is not the telephone that she usually carried with her. She would not give Darin her personal cell phone number. Darin testified that there has been a lot of interference during his weekly telephone calls.

Even though K.S.A. 2015 Supp. 23-3203(j) requires the district court to consider the ability of the parties to communicate, cooperate, and manage parental duties, the district court found that Alisha had failed to provide Darin with information about the children's health, medical, or educational needs even when asked. That finding was supported by the record. Darin testified that Alisha does not provide him information regarding the children's education or health. For example, he was not given timely notification about the Jump Start program or kindergarten roundups.

16

Our review of the record reveals that the district court applied the material change of circumstances and best interests of the child standards to the facts. While the district court did not mention in its ruling all the factors enumerated in K.S.A. 2015 Supp. 23-3203, the district court did focus on three factors, the best interests of the child standard, and the material change of circumstances standard. Thus, the district court applied the correct law. Alisha did not challenge the lack of factual findings below, so this court reviews the record to determine whether the record supports the district court's judgment. See *In re Marriage of Whipp*, 265 Kan. at 509. This court cannot and will not determine that one statutory factor weighs heavier than others.

Though the evidence was contested, the district court's findings are supported by evidence in the record. The two parents gave very different stories. The district court had to decide which parent was more credible. The parties presented conflicting evidence about why it would be in the best interests of the children to reside with one parent or the other. We cannot reweigh the evidence or reassess the credibility of the witnesses. The trial court has the ability to see the witnesses, observe their demeanor, and assess the character of the parties, whereas an appellate court does not. See *Simmons v. Simmons*, 223 Kan. 639, 643, 576 P.2d 589 (1978). It is not the function of an appellate court to "'delve into the record and engage in the emotional and analytical tug of war between two good parents over [their child].'" *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 701.

In this case, we cannot say that no reasonable person would have come to the same conclusion. Where the evidence does not strongly point to one parent over another, the district court is in the best position to determine the best interests of the children. See *In re Marriage of Steele*, No. 110,593, 2014 WL 1708125, at *4 (Kan. App. 2014) (unpublished opinion). We see no reason to modify the district court's holding on this point, as we find no abuse of discretion.

*Declining to interview a child was not erroneous.*

Alisha's counsel asked the court to interview in chambers one of her children from a different relationship, not to prove the truth of the sexual abuse allegation but to prove that the allegation was not manufactured by Alisha. The court asked, "So you want the Court to interrogate an eight-year-old-boy?" Counsel responded, "No, I don't. I don't want you to interrogate. . . . [A]nd I don't want to call him as a witness. . . . But if the Court feels that conversing with the little boy might be helpful and enlightening, fine. If the Court doesn't want to do that, then fine." The court declined to interview the child, stating:

> "I think I'm not trained in the manner at which I should approach this. I might fumble the approach. I might do something that scares him, makes him relive an incident.
> "I think I've heard sufficient information here today to make a decision and I think I can draw inferences from the testimony made here today to make a sufficient decision on this issue."

While K.S.A. 2015 Supp. 23-3209 provides that the court "may interview minor children in chambers to assist the court in determining legal custody, residency, visitation rights and parenting time," we do not agree that the statute applies to other minor children. The statute is plainly discretionary by its terms.

We find no abuse of discretion in the trial court's wise decision not to interview the child. Besides, the child's statements would have been cumulative. Another of Alisha's children had already testified that she was present when her brother spontaneously made the sexual abuse allegation. Obviously the court considered that neither a DCF nor a criminal investigation substantiated the sexual abuse allegation. This is clearly not reversible error.

In the same vein, the district court sustained an objection to the admission of an e-mail into evidence because it had not been provided in discovery. The e-mail is not in the record. There are also no discovery orders in the record. Alisha now contends the district court erred by not allowing that e-mail into evidence because it would have shown that she had, in fact, made contact with Darin about the children's extracurricular activities. We are not persuaded that this is erroneous. The district court's ultimate decision did not depend heavily on whether or not Alisha had sent an e-mail to Darin one time about the children's school activities. To the contrary, Darin testified about the relative lack of communication over a long period of time. We cannot say that no reasonable person would have excluded the e-mail under the circumstances, especially if it violated a discovery order.

We see no valid reason to modify the court's decision.

Affirmed.